## WRIGHT v. SEAMAN.

(Supreme Court, Appellate Division, Third Department. July 6, 1898.)

1. ASSIGNMENTS FOR BENEFIT OF CREDITORS—FRAUD—EVIDENCE.
   Evidence of subsequent acts is competent to show the intent in making an assignment for benefit of creditors with preferences.

2. SAME—SUFFICIENCY OF EVIDENCE.
   A debtor considered himself solvent, but made an assignment, thinking more could be realized in that way. Only one creditor was pressing, and his claim had reached an agreement for adjustment, the father of the debtor promising to indorse notes to the creditor, who agreed to renew

them; but the debtor put him off with promises he did not intend to keep, while an assignment of all his goods was being drawn up to his father, whom, with other relatives, he made preferred creditors. He continued the business, and bought up claims against himself, for one-third their face value,. with the proceeds of the business. The assignee sold the stock to the debtor's brother, who was a teacher, for much less than its value; the consideration being largely a former debt, and payments made from the proceeds of the business. *Held*, that the assignment was fraudulent.

Appeal from trial term, Tompkins county.

Action by Hanford B. Wright, as assignee for the benefit of creditors of Olin H. Wright, against Charles S. Seaman. From a judgment for plaintiff, and an order denying a new trial, defendant appeals. Reversed.

For several years prior to 1896 one Olin H. Wright had been conducting a jewelry store in the city of Ithaca. During the winter of 1896 he had become and was indebted to the firm of N. H. White & Co., of the city of New York, in the sum of about $1,800. In the spring of 1896 the said Olin H. Wright promised that, if he could not get the cash to pay upon such account, he would send notes indorsed by his father to White & Co. Thereafter, and on the 7th day of July, an agent of White & Co. (one Huyler) called upon Wright, and said that something must be done, and asked him, if he could not pay anything on his account, if he would give White & Co. the notes that he had written about, and his father had promised to indorse. Mr. Wright said he would if his father would indorse them. The father was brought in, and the matter explained to him, and the father said that he would indorse the notes if the son requested it. Olin says that Huyler promised that the notes should be renewed if he was unable to meet them when they became due. The number and amount of the notes was agreed upon, and the rate of interest; and, according to the testimony of Huyler, Mr. Wright promised to make out the notes, and have them ready at half past 1 o'clock. When Huyler came back, at 1 o'clock, Mr. Wright told him that he had been very busy, and had not had time to make out the notes, and told him to call again at 5 o'clock. The father was present at that time. Huyler came to the store again about 5 o'clock, and Mr. Wright told him that he had been busy, and had not had time to make out the notes, but told him that, if he would come back about 7 o'clock, he would have them ready. Upon Huyler saying to him, "You close your store before that," he said, "I'll either be here at the store, or will bring the notes over to the hotel." Huyler returned to the store about 7 o'clock, and found it closed. He then went to the hotel, but did not find Mr. Wright, and did not see him until after he had ascertained that an assignment had been made. There is no substantial denial by Mr. Wright of this transaction. It is true, he says that he did not promise to sign the notes; but he admits the substance of the conversation, the bringing of his father there, and explaining the matter to him, and of his father's promising that he would indorse notes if he (the son) requested it. The discussion as to the amount of interest, the making out of a list of the notes in his own handwriting, his telling the agent to come back later in the day, his telling him that he had not had time to make out the notes,—all this he admits, and says: "I told him to come later in the day, and he came back in the afternoon. I told him I had not had time to draw them. I put him off until 7 o'clock. I think there was something said about the store being open until 7 o'clock. I told him that it would be, and I would be there; that, if I closed the store, I would come to his hotel. I didn't do either one. I was neither at the store nor hotel. When I told him that, I didn't intend to meet him. Practically speaking, I lied to him." Wright's evidence is that, instead of meeting Huyler that evening, he took a revolver, and went out in a boat upon the lake, intending to commit suicide, and remained upon the lake until about 3 o'clock in the morning, when he returned home. On the 8th he remained in his house all day,—as he claims, sick in body and in spirit because of his business troubles, refusing to see callers, among whom was Mr. Huyler.

His father called upon him, and an attorney was sent for, and during the evening of the 8th an assignment was drawn up for the benefit of his creditors; his father, the plaintiff in this action, being made assignee. There are nine preferences in the assignment. The first provides for the expenses of the administration of the estate; the second, for salaries; the third, to his brother-in-law; the fourth, to his father; the fifth, to his wife; the sixth, to his father-in-law; the seventh, eighth, and ninth, to pay notes indorsed either by his father or brother. In the language of the assignor, "Every single preference in there is to a relative, either by blood or marriage." The schedule filed under this assignment shows the amount of debts and liabilities to be $11,253.02; the nominal assets, $14,245.15; actual assets, $13,551.92, subject to a lien, by way of a mortgage and interest, of $1,507.66. The assignor says: "I thought I was solvent right along. That was my belief at the time I executed this assignment, providing the goods could be disposed of at a fair value. When I made this assignment, I thought there would be more left if the assignee could go ahead, perhaps, and dispose of the property and pay off the creditors, than if creditors were to sue me and sell at forced sale. I thought there would be more left for me in that case. When I made this assignment I thought there would be more realized out of it for the creditors and for myself than would if suits progressed into judgments, and the property sold at sheriff's sale. I thought by making this assignment I would have a larger surplus for myself than if Mr. Huyler or other creditors commenced legal proceedings." On the morning of the 9th of July the plaintiff, as assignee, went to his son's store to take possession under the assignment, and found that the defendant, the sheriff of the county, had broken into the store, and was in possession under a warrant of attachment issued in an action wherein the firm of White & Co. were the plaintiffs, and his son Olin was the defendant. The sheriff thereafter proceeded to sell under his warrant of attachment, and the execution issued in the judgment obtained in the action by White & Co. against Olin H. Wright. The sheriff realized upon the sale the sum of $2,031, which the defendant testifies was the amount of the judgment, costs, and sheriff's fees, and the costs and expenses of the sale. There was a balance realized from the sale of $1.40 over and above the amount necessary to discharge the judgment and other expenses referred to, which the defendant turned over to the plaintiff in this action. After the sale the sheriff turned over the balance of the property to the plaintiff as assignee. The assignee commenced this action against the defendant for conversion, and recovered a judgment against him for $4,000 damages and $169.41 costs; and it is from such judgment, and an order denying a motion for a new trial, that this appeal is taken.

After the defendant turned over the assigned property to the plaintiff, Olin H. Wright (the assignor) and his wife conducted the business for the plaintiff as assignee; conducting the sales, which were made at retail, apparently in the ordinary course of business, and as they had done before the assignment. Olin occupied a bench in the store, and repaired watches and jewelry. This was a part of the business carried on by him before the assignment, in connection with the jewelry business. Olin received from his father a salary of $20 a week for acting as clerk and managing for him. Olin's wife assisted him in conducting the business, and they testified that what Olin made upon the bench, mending watches and jewelry, he turned over to her as her compensation; the theory being that while she acted as saleswoman it enabled Olin to work at the bench, and that the proceeds of his work there went to pay her for her services. This continued until about the 13th of December, 1896, when the plaintiff transferred what was left of the property to his son Ellsworth D. Wright for the sum of $1,404.66. Of that amount, $404.66, it is claimed, was paid in cash, and a note of $1,000 taken for the balance; and, of that $1,000, $900 appears to have been paid at the time of the trial of this action,—$500 of it being paid by canceling the individual note of the plaintiff, which his son Ellsworth D. Wright held against him, and the balance was apparently paid from the proceeds of the business. No attempt was made by the plaintiff to show the actual value of the property transferred to Ellsworth D. Wright, and we are left to ascertain it from the inventory, deducting therefrom the amount sold prior to the sale to Ellsworth. As before stated,

the actual value of the assignor's assets were alleged to be $13,551.92. The plaintiff claims that the actual value of the property sold by the sheriff was $3,868.33. The plaintiff testifies that he received the sum of $1,797.18 while he had charge of the store, which would make in the aggregate the sum of $5,665.51, to be deducted from the actual assets, leaving apparently the sum of $7,886.41. Of the actual assets, property of the value of $2,492 was property outside of the store, and which does not appear to have been sold to Ellsworth D. Wright, and which should therefore be deducted from the above sum, leaving a balance of $5,394.41 in value, apparently, which was transferred to Ellsworth D. Wright for $1,404.66. After the sale to Ellsworth D. Wright, Olin H. and his wife still continued to conduct the business as before. Ellsworth, it appears, was not a business man, but was a tutor engaged in Cornell University. The only time he appears to have rendered any assistance in conducting the business was during the holiday season, between Christmas and New Year's. In the meantime it appears that the attorney who drew up the assignment was engaged in buying up the claims of creditors against the estate, representing that friends of Mr. Wright were disposed to aid him as far as limited means would permit, and that "litigation, which is liable to be lengthy, makes it doubtful as to how much the assigned estate will be able to pay, or how soon its affairs may be settled." The attorney purchasing such claims, upon being examined, said, "Of those which I have purchased, I think every dollar was furnished to me by Florence Wright,—something in the neighborhood of $400." Florence Wright was the name of Olin's wife. Olin claims that the money to buy up these claims was his wife's money, but it appeared upon the wife's examination that the only means that she possessed were notes to the amount of about $200 which she held against her husband at the time of the assignment, and the money she received from him from time to time, after the assignment, for services rendered by her in the assigned business. A portion of the money, at least, to buy up these claims, was given by Olin to the attorney himself. He testifies: "I did not hand Tarbell all the money to do this with. I could not tell how much. I should say, one hundred or two hundred dollars. That I have handed him, through my wife, to buy up claims against myself. I, physically, have handed it over. This money I paid is the proceeds of my labor upon the bench."

Argued before PARKER, P. J., and LANDON, HERRICK, PUTNAM, and MERWIN, JJ.

Newman, Blood, Banks & Bostwick (Chas. H. Blood, of counsel), for appellant.

George S. Tarbell (S. D. Halliday, of counsel), for respondent.

HERRICK, J. An assignment for the benefit of creditors must be interpreted, like other instruments, according to the intent of the parties, and, if possible, such a construction given it as will sustain rather than defeat it. Roberts & Co. v. Buckley, 145 N. Y. 215, 39 N. E. 966. When, however, the distribution of the estate is to be made unequally among the creditors, and some are preferred to others in payment, the assignment is not viewed by the court with any favor, and is only tolerated and upheld when all conditions are met for the prevention of fraud. Mills v. Parkhurst, 126 N. Y. 89, 26 N. E. 1041. And, when it also appears that all the persons to be preferred in this unequal distribution of the estate are the relatives of the assignor, the assignment should be viewed with still less favor by the court, and the whole transaction rigidly scrutinized, to see that the provisions of the statute have not been availed of to defeat its spirit, and benefit the assignor and his family at the expense of creditors. While it has been held that relationship between assignor and as-

signee, and a preference given to the latter as a creditor, prove nothing by themselves, but are consistent with honesty and innocence, yet it was also held that other circumstances indicative of fraud may invest them with a new character and purpose, and transform them from equivocal and ambiguous facts into positive badges of fraud. Shultz v. Hoagland, 85 N. Y. 464. Here we have much more than the assignee being a relative and a preferred creditor. All the other preferred creditors are likewise relatives, and the person to whom the property was finally transferred is also a relative. Many of the suspicious circumstances in this case are transactions that occurred after the assignment; and while an assignment is valid or invalid at the time of its execution, and cannot be made either by subsequent unconnected acts, yet subsequent acts may reflect light back upon the original intent, and help us to discern that correctly. Shultz v. Hoagland, 85 N. Y. 464; McNaney v. Hall, 86 Hun, 415, 33 N. Y. Supp. 518. The use that is made of the assignment, and the acts of the parties under it, furnish data to judge of the motive and intent with which it was executed. Forbes v. Waller, 25 N. Y. 430. And, coupling these after-occurrences with what took place before and at the time of the assignment, I cannot resist the conclusion that this assignment was made with the intent to hinder, delay, and defraud the creditors of the assignor. The assignor considered himself solvent. His reasons for making an assignment, as stated by him, in brief, were that he thought more could be realized from his property in that way than if his creditors entered up judgments against him, and his property was sold out upon execution. Yet, so far as appears from the evidence, only one of his creditors was pressing; and, while he could not then raise the money to pay such claim, still it could have been adjusted, and time secured for its payment, by giving his notes, indorsed by his father, extending over a series of months, with an agreement to renew them if he was unable to meet them at maturity. His father expressed his willingness to indorse if he desired him to do so. He agreed to furnish such notes, and specified the times when he would have them prepared, which promises he did not keep, and avows that he did not mean to keep them when he made them. He made an assignment to his father, whom, together with other of his relatives, he made preferred creditors. He remained in possession and conduct of the business, except when excluded by the sheriff, and, with the fruits of his earnings while transacting that which before the assignment was a part of his business, he, either by himself or through his wife, caused negotiations for the purchase, and purchases were actually made, of claims against him, for a third of their face value. And finally what remained of the property was transferred to a brother, who is by profession a teacher, for a consideration apparently much less than its value, and for the larger portion of which purchase price time was given, and the note of the alleged purchaser taken, and payments made upon that, partially from the proceeds of the business, and partially by extinguishing a note of the assignee held by the purchaser. Considering the circumstances under which this sale was made, it was incumbent, I think, upon the parties to it, to show that the price was adequate; and, if the appar-

ent value of the remainder of the estate was not the real value, F
think it was incumbent upon the plaintiff to show that fact.    For
these reasons, I think the assignment should be held fraudulent and'
void, and it follows that the order and judgment appealed from should'
be reversed.

Judgment and order reversed, and a new trial granted; costs to,
abide the event. All concur.    MERWIN, J., concurs in result.